**WAUSAU PAPER MILLS
COMPANY, Plaintiff,**

v.

**CHAS. T. MAIN, INC., Defendant.**

**No. 91–C–0524–C.**

United States District Court,
W.D. Wisconsin.

April 9, 1992.

James R. Clark, Foley & Lardner, Milwaukee, Wis., for Wausau Paper Mills Co.

William A. Wiseman, O'Neill, Cannon & Hollman, S.C., Milwaukee, Wis., for Chas. T. Main, Inc.

OPINION and ORDER

CRABB, Chief Judge.

Plaintiff brought this civil action for damages against defendant in the Circuit Court for Marathon County, Wisconsin, alleging negligence and breach of warranty in connection with a contract for pulp mill improvements. Defendant removed the action to this court pursuant to a timely notice of removal. The case is before the court on defendant's motion for partial summary judgment with respect to plaintiff's negligence claim and claim for consequential damages.

Defendant contends that plaintiff's negligence claim must be dismissed because the economic loss doctrine precludes recovery in tort and that the claim for consequential damages must be dismissed because the contract between the parties does not permit recovery of such damages. I agree with defendant that Wisconsin's economic loss doctrine precludes tort recovery for economic loss where there is a contractual relationship between two sophisticated parties, regardless whether the contract is for products or services. I conclude that the contract terms are not unconscionable and that plaintiff cannot seek consequential damages because such damages are excluded by the contract.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 255.

For the sole purpose of deciding this motion for summary judgment, I find from the parties' proposed findings of fact that the following material facts are undisputed.

## UNDISPUTED FACTS

Plaintiff Wausau Paper Mills Company is a multi-million dollar corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Clarks Island, Wausau, Wisconsin. Plaintiff manufactures various types of paper products. Defendant Chas. T. Main, Inc., is a multi-million dollar foreign corporation with its principal office and place of business located at Prudential Center, Boston, Massachusetts. Defendant provides professional engineering and design services.

Between March 1988 and June 1988, plaintiff and defendant entered into arm's-length negotiations. On March 16, 1988, defendant submitted to plaintiff a proposed contractual agreement and a confidentiality agreement. On March 18, 1988, defendant submitted a proposal for design engineering services for plaintiff regarding plaintiff's continuing mill modernization and expansion program at its Brokaw Mill facility.

On May 9, 1988, plaintiff requested revisions of the previously proposed contract. Specifically, plaintiff requested changes in the following sections of the contract: Payment for Services, Warranty, Compliance with Laws, Assignments, Reuse of Documents, Termination, and Governing Law.

On June 29, 1988, a contract was signed between the parties, incorporating the majority of plaintiff's suggested revisions, and including the following provisions:

Section 3:1

WARRANTY—MAIN warrants that the services rendered pursuant to this AGREEMENT shall be performed in accordance with the standards customarily provided by an experienced and competent professional engineering organization rendering the same or similar services and that the PROJECT as designed will be fit for CLIENT'S particular purpose as specified in the Scope of Services and comply with all applicable specifications for the PROJECT set forth in the Scope of Services or otherwise developed and agreed to by MAIN and CLIENT during the performance of the services contemplated by this AGREEMENT. MAIN shall reperform any of said services which were not performed in accordance with this standard provided that MAIN is notified in writing of the non-

conformity within one (1) year from the date of CLIENT'S acceptance of the PROJECT after final completion of all construction and satisfactory start-up, testing and inspection of all systems connected therewith except that if, through no fault of MAIN, CLIENT has not so accepted the PROJECT within one year of completion of MAIN'S services, this period shall not exceed 18 months from the completion of MAIN'S services. MAIN will perform the remedial services at its own cost; provided however, that the cost of such remedial services shall not exceed an aggregate amount equal to the amount paid by CLIENT to MAIN hereunder. It is further expressly provided that MAIN does not warrant against and shall have no liability for the effects of corrosion, erosion, or wear and tear of equipment and materials or failure of equipment and materials due to faulty operations or conditions of service more severe than specified in the design of the equipment and materials. Except as hereinafter provided in respect of personal injury or property damage, the foregoing are MAIN'S entire responsibilities and CLIENT'S exclusive remedies for services rendered or to be rendered hereunder, and no other warranties, guarantees, liabilities or obligations are to be implied.

Section 3:3

INDEMNITY—MAIN shall indemnify, defend and hold CLIENT harmless from and against claims, liabilities, suits, loss, cost, expense and damages for injury to or death of persons or damage to or destruction of property including, but not limited to, the property of CLIENT, arising in connection with MAIN'S negligent performance of the work and services pursuant to this AGREEMENT except to the extent caused by negligence of CLIENT or its contractors, agents or employees. MAIN'S liability for all of the aforesaid matters is limited to the proceeds recovered from the insurance carried by MAIN and within the coverage limits specified in SECTION 5 below after settling claims of third parties.

Section 3:6

CONSEQUENTIAL DAMAGES—In no event shall MAIN or its subcontractors of any tier be liable in contract, tort, strict liability, warranty, or otherwise, for any special, indirect, incidental or consequential damages, such as, but not limited to, delay, disruption, loss of product, loss of anticipated profits or revenue, loss of use of the equipment or system, non-operation or increased expense of operation of other equipment or systems, cost of capital, or cost of purchased or replacement equipment systems or power.

Section 8

ENTIRE AGREEMENT. This AGREEMENT supersedes any prior AGREEMENT, oral or written, and contains all of the terms and conditions agreed upon by the PARTIES hereto with respect to the subject matter hereof. No other AGREEMENTS, whether oral or written, not specifically referred to or included herein, shall be deemed to exist or modify this AGREEMENT or bind the PARTIES hereto. It is specifically agreed that MAIN'S services will be rendered in accordance with the terms and conditions of this AGREEMENT and that any standard or preprinted terms appearing on or made a part of any Purchase Order, Task Authorization or similar document shall not apply.

Section 6

GOVERNING LAW. This AGREEMENT shall be governed by the laws of the State of Wisconsin.

Plaintiff received professional engineering and other services from defendant on the Brokaw Mill project. Defendant did not supply equipment or other manufactured products to plaintiff on this project. Pursuant to a budget change request, defendant agreed to assume responsibility to interface, coordinate with, and assist the supplier of the new computer system on the project. These services did not involve design work in the conventional sense. There is nothing defendant or anyone else can do with respect to redesign work that will in any way reduce or eliminate the losses incurred by plaintiff with respect to defendant's involvement in the computer programming.

Defendant also agreed to assume responsibility for coordinating the flushing of the new pulp production system. A substantial delay of time occurred in the flushing of the system, and excess costs and production losses were incurred by plaintiff. The obligations defendant assumed with regard to the flushing were not for design services. The flushing procedures were completed eventually. Redesign work from defendant or anyone else will not reduce any of the losses sustained by plaintiff in connection with the flushing operation.

Also, plaintiff experienced a problem in connection with the start-up and processing of the pulp related to the hypofiltrate tank. A pipe connecting the outer tank to the inner tank was missing. Defendant's employee reviewed the shop drawings supplied by the tank's manufacturer and did not discover that the inner tank connection had been omitted from the drawings. Once this omission was discovered, no redesign services supplied by defendant or anyone else would reduce the losses sustained by plaintiff as a result of defendant's failure to discover the error.[1]

The limitations provisions in the contract purport to leave plaintiff without a damages remedy for any of its breach of contract claims.

## OPINION

This suit is premised on plaintiff's contention that defendant's negligence and breach of warranty caused plaintiff substantial loss, including "costs to repair or replace the improperly designed piping, pumps and equipment, engineering costs to evaluate the design and engineering deficiencies and recommend corrective action, down time costs and lost production, and internal administrative and engineering costs ..." Plaintiff's complaint, ¶ 7. Plaintiff does not deny that the damages it seeks are for "economic loss," which has been defined as

'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ...' as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' *Chicago Heights Venture v. Dynamit Nobel of America,* 782 F.2d 723 (7th Cir.1986) (quoting *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982)).

"Economic loss" is not the most felicitous term for the kind of damage it describes. Economic loss does not refer to every kind of loss or every diminution in the value of property; rather, it refers to a diminution in the value of a particular product caused by the product itself or by the failure of the product to function as represented, in other words, to failed economic expectations. If a lawnmower fails to work as intended and throws off a piece of metal that lands in the operator's eye, causing him to miss work and incur medical losses, those are economic injuries that can be recovered in a tort action. They are not covered by the term "economic loss." If the lawnmower's malfunctioning causes it to wear out in a short time, requiring replacement, that is economic loss. Where such a loss is the only loss involved, the lawnmower's owner may sue only in contract. Injury to the product itself is the kind of harm that is left entirely to the law of contracts. Claims for negligent design or defective manufacturing are barred; the economic loss doctrine makes tort remedies unavailable for persons whose only injury is a loss in their expectations for a product. *See East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), in which the Supreme Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products

---

1. Defendant stated that it "rebutted" the proposed facts in the last three paragraphs but stated that for purposes of the summary judgment motion, the facts were irrelevant. However, defendant did not rebut the facts properly because it did not point to any evidence in the record that would put plaintiff's proposed facts into dispute. Because I find the facts to be material, they have been included.

liability theory to prevent a product from injuring itself."

*East River* was a suit brought by charterers of supertankers against turbine manufacturers for alleged design and manufacturing defects that caused the supertankers to malfunction. The Court concluded that public policy precluded a tort remedy for economic loss caused by a defective product because repair costs, decreased value and lost profit are "essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *East River*, 476 U.S. at 870, 106 S.Ct. at 2302. Commenting on broader public policy concerns, the court stated:

> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, ... we see no reason to intrude into the parties' allocation of risk.

*Id.* at 872–73, 106 S.Ct. at 2302–03 (citations omitted).

Although *East River* involved manufactured products, courts have used its broad policy rationales to extend its application. *See PPG Industries, Inc. v. Sundstrand Corp.*, 681 F.Supp. 287, 291 (W.D.Pa.1988) ("To decline to follow the *East River* ... analysis because the contract at issue involved designing and testing ... rather than manufacturing ... would be to disregard the Supreme Court's integral understanding of the distinction between contract and tort remedies."); *Palco Linings, Inc. v. Pavex, Inc.*, 755 F.Supp. 1269 (M.D.Pa.1990) (although Pennsylvania had not applied economic loss doctrine to construction cases, plaintiff's losses were purely economic and not recoverable in tort); *Learjet Corp. v. Spenlinhauer*, 707 F.Supp. 44 (D.Me.1989), *modified*, 901 F.2d 198 (1st Cir.1990) (damages claim for repair costs and lost revenues caused by negligence in the design of Learjet barred under Kansas law because the damages represented a loss of the benefit of the bargain and not an unexpected loss to person or property); *Carmania Corp. N.V. v. Hambrecht Terrell Int'l*, 705 F.Supp. 936, 938 n. 3 (S.D.N.Y.1988) ("Although the economic loss rule was first applied in products liability cases, New York courts have extended it to suits against suppliers of services, such as architects, engineers, accountants, and attorneys."); *2314 Lincoln Park West Condominium Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990) (claim that architectural firm was negligent in its design of a structure concerned quality of structure rather than safety and was more appropriately resolved under contract law); *but see McCarthy Well Company, Inc. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312 (Minn. 1987) (where predominant purpose of the contract was for provision of services, the Uniform Commercial Code did not apply and the economic loss rule did not preclude a negligence claim).

As a general rule, Wisconsin has allowed tort recovery for loss of profits. In *A.E. Investment Corp. v. Link Builders, Inc.*, 62 Wis.2d 479, 214 N.W.2d 764 (1974), the defendant contracted with a development company for the construction of a commercial building. Plaintiff operated a supermarket within the completed building. It alleged that defendant had designed the building negligently, causing damage to plaintiff's premises. The court held that "in accordance with the settled negligence law of this state, damages may be awarded for the economic loss alleged by the plaintiff if considerations of public policy do not intervene in the particular case to prevent such liability." *Id.* at 490, 214 N.W.2d at 770.

However, in *Sunnyslope Grading, Inc. v. Miller, Bradford and Risberg, Inc.*, 148 Wis.2d 910, 437 N.W.2d 213 (1989), the Supreme Court of Wisconsin adopted the economic loss doctrine. Plaintiff sought damages for replacement parts, labor charges, down-time expenses and lost prof-

its associated with repairs not covered by defendant manufacturer's warranty. The warranty was limited to replacement and specifically excluded consequential damages. Plaintiff argued, as does the plaintiff in this case, that there was an independent duty upon which to base a tort claim. The state supreme court held that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly ... where the warranty given by the manufacturer specifically precludes the recovery of such damages." *Id.* at 921, 437 N.W.2d at 217–18. In arriving at its conclusion, the court considered the Supreme Court's policy arguments in *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 106 S.Ct. 2295. Distinguishing *A.E. Investment*, 62 Wis.2d 479, 214 N.W.2d 764, the court noted: "However, *A.E. Investment* concerned negligent performance of services and no warranty was involved. The case did not hold that a tort claim existed for economic losses incurred after the purchase of a product when two commercial entities were in privity of contract." *Id.* at 918, 437 N.W.2d at 216.

Plaintiff contends that *Sunnyslope* is inapplicable because it deals with manufactured products and because the Uniform Commercial Code formed the basis for the court's decision. Although the court relied in part on the legislative protections of the Uniform Commercial Code as a justification for denying tort recovery, the court did not cite the Uniform Commercial Code as the only method of protection: "The question of product value and quality is intended to be addressed by warranties and the Uniform Commercial Code. Contract law, the law of warranty and the Uniform Commercial Code are designed to allow the parties to allocate the risk of product failure." *Sunnyslope*, 148 Wis.2d at 920–21, 437 N.W.2d at 217. The holding is not limited to the Uniform Commercial Code; contracts and warranties protect parties against risks also.

In addition, *Sunnyslope* and the cases cited therein are not based on a distinction between products and services. Rather, the important distinctions appear to be whether the parties are in privity of contract or parties to a warranty. The court distinguished *La Crosse v. Schubert & Asso.*, 72 Wis.2d 38, 240 N.W.2d 124 (1976), in which it had held that damages to the product itself were recoverable in tort. It found "the application of this language must be limited to the facts of the *La Crosse* case and therefore only applies to cases in which there is no warranty or contract between the parties." *Sunnyslope*, 148 Wis.2d at 917, 437 N.W.2d at 216. The court cited the holding of the Court of Appeals for the Seventh Circuit in *Wisconsin Power & Light v. Westinghouse Elec.*, 830 F.2d 1405 (7th Cir.1987) (applying Wisconsin law), that "a warranty between the parties stating that Westinghouse would not be liable in tort for incidental or consequential damages provided an additional, independent basis for granting summary judgment." *Sunnyslope*, 148 Wis.2d at 920, 437 N.W.2d at 217. Finally, the court cited five cases in which courts had rejected tort claims brought for economic loss. In one of them, *Great American Ins. Co. v. Paty's Inc.*, 154 Mich. App. 634, 397 N.W.2d 853 (1986), the court found no cause of action in tort where the relationship between the parties was contractual and there was no personal injury or damage to property. In another, *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49 (S.D.Oh.1986), plaintiffs pursued a negligence claim against the defendant designer, alleging that defendant owed a duty of reasonable care to the owners in the performance of its services. The court concluded that "since there is a written contract between sophisticated parties and plaintiffs seek recovery for economic loss alone, plaintiffs are limited to such remedies that are available under contract law." *Id.* at 60.

In *Sunnyslope* the state court distinguished *A.E. Investment* in part on the basis of services and relied to some extent on the Uniform Commercial Code. In addition, it placed great weight on the existence of a warranty and a contractual relationship. It is doubtful that it would continue

to do so. *See Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295 (7th Cir. 1991): "[T]here is now substantial evidence that Wisconsin would decline *in all circumstances* to allow a negligence suit for recovery of only economic damages, even when there is no contractual relationship between the parties." *Id.* at 1300. (emphasis added). The court added that "despite whatever ambiguity might remain about the existence of a tort cause of action for economic injury alone in the total absence of a contractual relationship, it is clear that Wisconsin would not permit such a cause of action when the parties have a contractual relationship and the injury is based on that relationship." *Id.* at 1300–01. I conclude that the policies enunciated in *Sunnyslope* are applicable to this case and do not preclude a finding that a suit based on services can come within the economic loss doctrine.

█ Plaintiff points to Wis.Stat. § 895.49 as additional support for its contention that Wisconsin's intent is to permit tort claims in the context of a construction dispute. That section provides in pertinent part:

(1) Any provision to limit or eliminate tort liability as a part of or in connection with any contract, covenant or agreement relating to the construction, alteration, repair or maintenance of a building, structure, or other work related to construction, including any moving, demolition or excavation, is against public policy and void.

Defendant contends this statute does not apply unless plaintiff asserts a viable tort claim. Because § 895.49 voids agreements in construction contracts that limit or eliminate tort liability, thereby limiting the parties' common law right to contract freely, the statute must be interpreted narrowly, placing the least possible restriction on the common law right. *Gerdmann v. U.S. Fire Ins.*, 119 Wis.2d 367, 350 N.W.2d 730 (Wis.App.1984). Section 895.49 does not permit parties to limit or eliminate tort liability in a construction contract where tort liability would otherwise obtain. However, the statute is irrelevant if there is no

tort claim to begin with. In *Sunnyslope* for instance, the product was construction equipment. Although this is "related to construction," the state supreme court did not hold that § 895.49 overrode the economic loss rule's prohibition against tort recovery. If Wisconsin courts would apply the economic loss rule to preclude plaintiff's tort claim in this case, § 895.49 will not resurrect the claim.

█ I am persuaded that Wisconsin's economic loss doctrine covers contracts for services where there is a warranty and a contractual relationship between two sophisticated parties. Plaintiff's claim does not allege injury to a person or to other property. Its loss "due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *East River*, 476 U.S. at 870, 106 S.Ct. at 2302. Therefore, plaintiff's tort claim for pure economic loss cannot go forward and defendant's motion for summary judgment will be granted with respect to this claim.

*Partial Summary Judgment Motion to Strike Consequential Damages*

The contract between plaintiff and defendant provides that defendant will not be liable in tort, contract or warranty "for any special, indirect, incidental or consequential damages, such as, but not limited to, delay, disruption, loss of product, loss of anticipated profits or revenue, loss of use of the equipment or system ... or cost of purchased or replacement equipment systems or power." Plaintiff is pursuing damages for "costs to repair or replace the improperly designed piping, pumps and equipment, engineering costs to evaluate the design and engineering deficiencies and recommend corrective action, down time costs and lost production and internal administrative and engineering costs...." Plaintiff's complaint ¶ 7. Thus, plaintiff is attempting to recoup damages prohibited by the contract.

Plaintiff contends that the provisions in the parties' agreement are unconscionable and therefore unenforceable because they

fail to provide plaintiff with a fair remedy. "Unconscionability has generally been recognized to include an absence of meaningful choices on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Discount Fabric House v. Wis. Telephone Co.*, 117 Wis.2d 587, 601, 345 N.W.2d 417, 424 (1984). Factors to be considered when determining unconscionability can be divided into procedural and substantive categories. Procedural factors include the parties' age, intelligence, business experience, bargaining power, whether the terms were explained to the weaker party, whether alterations in the terms were possible, and whether there were alternative sources of supply. *Id.* at 602, 345 N.W.2d at 425. The substantive determination is whether the contract terms are commercially reasonable. *Id.*

██ Plaintiff and defendant are multimillion dollar corporations; plaintiff does not contend that their bargaining power was unequal. Plaintiff does not contend that it did not understand the terms of the contract; indeed, plaintiff requested revisions to several sections of the contract. Because the procedural aspects of the parties' contract appear to have been reasonable, the unconscionability determination will turn on the substantive question: whether the terms of the contract are commercially reasonable.

The contract excludes consequential damages for commercial loss only. An indemnity clause holds defendant responsible for any "claims, liabilities, suits, loss, cost, expense and damages for injury to or death of persons or damage to or destruction of property." The warranty clause makes reperformance plaintiff's exclusive remedy, with the cost of the remedial services not to exceed an aggregate amount equal to the amount paid by plaintiff under the contract.

Policy concerns disfavor stipulated damages clauses. "Stipulated damages substantially in excess of injury may justify an inference of unfairness in bargaining or an objectionable *in terrorem* agreement to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective." *Wassenaar v. Panos*, 111 Wis.2d 518, 528, 331 N.W.2d 357, 362 (1983). However, there is a competing policy emphasizing the need for the enforcement of stipulated damages clauses because they allow parties control of their exposure to risk by deciding payment for breach in advance. *Wassenaar*, 111 Wis.2d at 528, 331 N.W.2d at 362. "Considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clause." *Id.* The reasonableness test ensures that courts can prevent abuse while respecting the parties' bargain. *Id.*

In this case the parties' contract terms are commercially reasonable. The contract did not bar plaintiff from seeking damages for losses in general, only for economic loss. Defendant was not in a more powerful position than plaintiff when the parties were engaging in arm's-length negotiations for three months. If plaintiff thought the remedial provisions inadequate, it could have requested revisions just as it did with other contractual terms it found unsatisfactory. The contract terms are reasonable. That plaintiff's losses went beyond what can be remedied by reperformance is a byproduct of risk allocation, not a result of unconscionability. Plaintiff must abide by the terms and cannot seek consequential damages. Defendant's motion for partial summary judgment to strike plaintiff's consequential damages claim will be granted.

## ORDER

IT IS ORDERED that defendant's motions for partial summary judgment as to plaintiff's negligence claim and for partial summary judgment as to plaintiff's claim for consequential damages are GRANTED.